**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

**IN ADMIRALTY**

| | |
|---|---|
| LENORE BURNLEY, as mother of CHAD JOSEPH, and on behalf of his beneficiaries, and<br><br>SALLYCAR KORASINGH, as sister of RISHI SAMAROO, and on behalf of his beneficiaries,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | **FIRST AMENDED COMPLAINT**<br><br>Case No. 1:26-cv-10364-LTS |

**INTRODUCTION**

1. On October 14, 2025, the United States government authorized and launched a missile strike against a boat carrying six people traveling from Venezuela to Trinidad. The strike killed all six, including Chad Joseph and Rishi Samaroo, two Trinidadian nationals who had been fishing in waters off the Venezuelan coast and working on farms in Venezuela, and who were returning to their homes in Las Cuevas, in nearby Trinidad and Tobago.

2. The October 14 attack was part of an unprecedented and manifestly unlawful U.S. military campaign of lethal strikes against small boats in the Caribbean and eastern Pacific Ocean. Since this military campaign began on September 2, the United States has launched 66 armed attacks against boats in international waters, killing an estimated 215 people. According to a White House official, these strikes have been conducted largely by unmanned aerial vehicles launched from U.S. naval vessels in the Caribbean.

3. The United States has not conducted these strikes pursuant to any congressional authorization. Instead, the government has acted unilaterally. And Trump administration officials,

including President Donald J. Trump and Secretary of Defense Pete Hegseth have publicized videos of the boat strikes, boasting about and celebrating their own role in killing defenseless people.

4.    These premeditated and intentional killings lack any plausible legal justification. Thus, they were simply murders, ordered by individuals at the highest levels of government and obeyed by military officers in the chain of command.

5.    In response to the strikes, members of Congress, former U.S. government officials from across the political spectrum, former military leaders and personnel, experts on the laws of war, and dozens of foreign governments, including some of the United States' closest allies, have condemned the U.S. military strikes as illegal. Reports indicate that inside the Department of Defense, many officers have questioned the legality of the strikes, and that some have even sought private counsel out of concern for potential criminal liability.

6.    Confronted with widespread denunciations, the government has made threadbare claims that the lethal boat strikes are lawful under the laws of war. It has pointed to a still-secret Office of Legal Counsel ("OLC") memorandum that reportedly determined that the United States is engaged in a non-international armed conflict against scores of unspecified drug cartels in Latin America. Whatever that secret memorandum states, it cannot render the patently illegal killings lawful.

7.    First, under the plain terms of the laws of war, also known as international humanitarian law ("IHL"), there is no actual armed conflict that could justify the use of lethal military force against the boats, nor was there one on October 14, when Mr. Joseph and Mr. Samaroo were killed. As a result, the United States' campaign of killings violates international laws prohibiting extrajudicial killings and federal law prohibiting murder.

8.    Second, even if there were a real armed conflict that could trigger the application of IHL, these airstrikes would still be illegal under that established body of law. Indeed, given that top U.S. officials ordered the direct, intentional, and unjustified killings of civilians, their actions amount to grave breaches of the 1949 Geneva Conventions, and, as such, war crimes punishable under federal and international law.

9.    The United States' unlawful killings of persons at sea, including Mr. Joseph and Mr. Samaroo, constitute wrongful deaths and extrajudicial killings as recognized by the Death on the High Seas Act ("DOHSA"), 46 U.S.C. § 30301 *et seq.*, a federal statute that entitles their survivors to compensation and redress. These wanton, willful, and outrageous killings also constitute torts under general admiralty and maritime law, *see* 28 U.S.C. § 1333. This body of law makes the United States liable to the Mr. Joseph's and Mr. Samaroo's families.

10.    Under DOHSA, "[w]hen the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas beyond 3 nautical miles from the shore of the United States, the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible." 46 U.S.C. § 30302. Courts have long held that homicide is a "wrongful act" within the meaning of DOHSA. *See, e.g.*, *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 560 (E.D. Va. 2007) (citing *The Samnanger*, 298 F. 620, 622 (D. Ga. 1924)).

11.    In this lawsuit, Mr. Joseph's mother and Mr. Samaroo's sister bring claims under DOHSA and general admiralty and maritime law seeking compensation for the killing of Mr. Joseph and Mr. Samaroo, for the benefit of their beneficiaries. Through this suit, Ms. Burnley and Ms. Korasingh also demand accountability for U.S. officials' brazen acts—taken in wanton disregard of the most elementary principles of law and humanity—that took away their loved ones forever.

**JURISDICTION AND VENUE**

12.    This Court has jurisdiction over this case pursuant to the admiralty and maritime jurisdiction statute, 28 U.S.C. § 1333, because the conduct complained of constitutes a wrongful act that caused deaths occurring on the "high seas," which are waters beyond three (3) nautical miles from the shores of the United States, 46 U.S.C. § 30302. The Court also has jurisdiction under 28 U.S.C. § 1333 because the United States' unlawful killings constitute general admiralty and maritime torts.

13.    Because this suit constitutes a "civil action in admiralty" that "could be maintained" against a "private person" in like circumstances, the Suits in Admiralty Act ("SIAA") waives the United States' sovereign immunity for Plaintiffs' claims brought under DOHSA and general admiralty and maritime law. 46 U.S.C. § 30903(a). Under the SIAA, 46 U.S.C. § 30906, venue is proper in this district because, when pursuing an action under the statute, non-resident aliens can "bring suit in any district on grounds that otherwise they would have no forum in which to sue." *Malajalian v. United States*, 504 F.2d 842, 844 (1st Cir. 1974) (collecting cases).

14.    Alternatively, because this suit constitutes a "civil action in personam . . . against the United States" for "damages caused by a public vessel of the United States," the Public Vessels Act ("PVA") waives the United States' sovereign immunity for Plaintiffs' claims brought under DOHSA and general admiralty and maritime law. 46 U.S.C. § 31102(a)(1). An aircraft launched from a naval vessel to carry out the vessel's mission is an "appurtenance" to the vessel. *See Anderson v. United States*, 317 F.3d 1235, 1237–38 (11th Cir. 2003). And injuries caused by an appurtenance to a vessel are deemed to be caused by that vessel under maritime law. *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 535 (1995). Further, upon information and belief, "the government of [Trinidad], in similar circumstances, allows nationals of the United States to sue in its courts," satisfying the PVA's reciprocity requirement. 46 U.S.C.

§ 31111. Finally, under the PVA, venue is proper in this district because where the public vessel at issue "is outside the territorial waters of the United States," and "no plaintiff resides or has an office for the transaction of business in the United States, the action may be brought in the district court of the United States for any district." 46 U.S.C. § 31104(b)(2).

15.  Plaintiffs invoke this Court's admiralty jurisdiction in light of this district's venerable history of adjudicating admiralty disputes. *See, e.g.*, *DeLovio v. Boit*, 7 F. Cas. 418 (C.C.D. Mass. 1815) (No. 3776) (Story, J.) (articulating the broad contours of federal courts' admiralty jurisdiction); *U.S. v. New Bedford Bridge*, 27 F. Cas. 91, 111 (C.C.D. Mass. 1847) (No. 15,867) (Woodbury, J.) (explaining that "[c]ourts of admiralty" may "proceed according to the law of nations" where "suits are brought in admiralty under the law of nations").

**PARTIES**

16.  Plaintiff Lenore Burnley is a citizen of Trinidad and Tobago and the mother of Chad Joseph, a Trinidadian national who the United States extrajudicially killed via a missile strike on or about October 14, 2025. Mr. Joseph's family has decided that Ms. Burnley will represent Mr. Joseph's estate and has retained local counsel in Trinidad for the purpose of effectuating Ms. Burnley's appointment as the estate's personal representative. Ms. Burnley brings this action as the anticipated personal representative of Mr. Joseph's estate and on behalf of Mr. Joseph's beneficiaries.

17.  Plaintiff Sallycar Korasingh is a citizen of Trinidad and Tobago and the sister of Rishi Samaroo, a Trinidadian national who the United States extrajudicially killed on or about October 14, 2025. Mr. Samaroo's family has decided that Ms. Korasingh will represent Mr. Samaroo's estate and has retained local counsel in Trinidad for the purpose of effectuating Ms. Korasingh's appointment as the estate's personal representative. Ms. Korasingh brings this action as the

anticipated personal representative of Mr. Samaroo's estate and on behalf of Mr. Samaroo's beneficiaries.

18.    Pursuant to the SIAA's and PVA's waivers of sovereign immunity, Defendant United States of America is responsible for all the acts and omissions of its agents, officers, and personnel described herein. Their conduct is attributable to Defendant because United States agents, officers, and personnel, including and under the command and control of President Donald J. Trump and Secretary of Defense Pete Hegseth, acting in their official capacities, authorized and/or carried out the killings of Mr. Joseph and Mr. Samaroo on the high seas.

## FACTUAL ALLEGATIONS

### The October 14, 2025 Lethal Strike That Killed Mr. Joseph and Mr. Samaroo

19.    On October 14, 2025, President Trump announced on his social media platform that he had "ordered a lethal kinetic strike" on a boat traveling in international waters "just off the Coast of Venezuela," killing six men. Donald J. Trump (@realDonaldTrump), Truth Social, https://truthsocial.com/@realDonaldTrump/posts/115373751811822463 (Oct. 14, 2025, 1:42 PM E.T.). Upon information and belief, this strike took place on or about October 14.

20.    The announcement included a 33-second video of the strike. *See* Reuters, *US Strike On Alleged Drug Boat Off Venezuela Kills Six, Trump* Says (Oct. 14, 2025), https://www.reuters.com/video/watch/idRW375415102025RP1. The video begins by showing a

6

small, entirely stationary boat in low-light conditions. For several seconds, the boat does not move or emit any light.



21.    A munition can then be seen rapidly falling towards the boat.



22.    The munition then strikes the boat, which is immediately consumed in flames.



23.    For the remainder of the video, the viewer can no longer make out the contours of the boat. It is legible only as a conflagration.



24.    According to a White House official, the boat strikes have been conducted largely by unmanned aerial vehicles launched from U.S. naval vessels in the Caribbean. *See* Charlie Savage & Julian E. Barnes, *War Powers Law Does Not Apply to Trump's Boat Strikes, Administration Says*, N.Y. Times, Nov. 1, 2025, https://www.nytimes.com/2025/11/01/us/politics/trump-boat-attacks-war-powers.html.

25.    Analysts have publicly concluded that, in connection with other boat strikes, the United States has deployed munitions that can be fired from helicopters and tilt-rotor aircraft launched from Navy warships and cargo vessels, such as the U.S.S. *Iwo Jima*, which was operating in the Caribbean on October 14.

26.    Upon information and belief, the October 14 strike was launched from a naval vessel.

27.    According to Trinidad and Tobago Foreign Affairs Minister Sean Sobers, Trinidadian authorities have obtained the coordinates of this strike and other strikes carried out by the U.S. military in the Caribbean Sea that verify that the strikes occurred outside of Trinidad and Tobago's territorial waters.

28. Upon information and belief, Mr. Joseph and Mr. Samaroo were on board the boat depicted in this video at the time the strike was carried out.

Chad Joseph

29. Before the United States killed him, Mr. Joseph was a 26-year-old resident of Las Cuevas, Trinidad, where he lived with his common law wife and their three minor children, for whom Mr. Joseph provided financial support, parental guidance, and nurture.



*Chad Joseph in Trinidad*

30. Like many residents of Las Cuevas, a small fishing community located approximately 20 nautical miles from Venezuela, Mr. Joseph often traveled between Las Cuevas and Venezuela for fishing and farm work in Venezuela. During these trips, Mr. Joseph would often stay in Venezuela for weeks, and occasionally months, at a time. Every day while in Venezuela, Mr. Joseph would call his wife and children, sometimes multiple times a day. Mr. Joseph would also regularly call his mother, Ms. Burnley, and would often have group WhatsApp calls with her and his wife.

31. In April 2025, Mr. Joseph traveled from Las Cuevas to Venezuela for fishing and farm work. Mr. Joseph's plan was to remain in Venezuela for a month or so. As he was on previous trips, Mr. Joseph was in regular contact with his wife and three children, and his mother, Ms. Burnley, while he was away.

32. In June or July, Mr. Joseph called his wife to let her know that he planned to return to Las Cuevas by boat. His plan was thwarted, however, when a boat Mr. Joseph found to transport him home encountered engine trouble and had to turn back to Venezuela.

33. For the next several weeks, Mr. Joseph tried to find another boat that could take him back to Las Cuevas. During this time, as usual, Mr. Joseph and his wife spoke daily. One conversation remains a particularly vivid and haunting memory for his wife: a call on September 2 or shortly thereafter, when media reports first appeared online about the U.S. military blowing up a boat that had left Venezuela with eleven people aboard. Mr. Joseph called his wife and Ms. Burnley to assure them that he was not aboard that vessel, and that he would be returning to Trinidad as soon as he could find a ride.

34. Over the next several weeks, Mr. Joseph continued his search for a boat ride home. As reports of the U.S. military's strikes against boats in the Caribbean Sea dominated the news in the region, Mr. Joseph became increasingly fearful of making the return trip. But he was determined to return to his wife and their children as soon as possible.

35. On October 12, Mr. Joseph called his wife to tell her that he had found a boat that was traveling to Las Cuevas and that he would be home in a couple of days.

36. That call was the last time his wife, or anyone else in his family, heard from Mr. Joseph.

37. On October 14, Ms. Burnley saw media reports that the U.S. military had blown up a boat just off the coast of Venezuela and called Mr. Joseph's wife about them. They immediately feared that Mr. Joseph was aboard this boat, as the timing of the strike directly coincided with Mr. Joseph's journey by boat from Venezuela to Las Cuevas and, upon information and belief, occurred in waters that Mr. Joseph traversed on that journey. Ms. Burnley and Mr. Joseph's wife repeatedly called Mr. Joseph's cellphone, but the line was dead. The line remains dead to this day.

38.    As no one has heard from Mr. Joseph since October 12, his family has concluded that Mr. Joseph was a passenger on board the boat that the United States destroyed on or about October 14.

39.    In October 2025, Ms. Burnley attempted to file a missing person's report about Mr. Joseph's disappearance with the Police Station in Matelot, Trinidad, where Mr. Joseph was born and Ms. Burnley still resides. But an officer there told Ms. Burnley that the report should be filed with the Maracas Bay Police Station in Las Cuevas, because Las Cuevas was the last place where Mr. Joseph had been seen alive in Trinidad. In December 2025, Mr. Joseph's wife filed a missing person's report with the Maracas Bay Police Station but has heard nothing from the Trinidad Police since doing so.

40.    Mr. Joseph's wife also arranged for a lawyer to file a Trinidadian Freedom of Information Act request with the Trinidadian government seeking information about the October 14 strike, to which, to date, they have received no response.

41.    Distraught and in need of moving towards closure, on October 22, 2025, Mr. Joseph's family held a memorial service for Mr. Joseph at his home in Las Cuevas. On November 22, 2025, his family held a second memorial service in Matelot, Mr. Joseph's birth village.

42.    Since then, Mr. Joseph's family has sought to pursue justice for his unlawful killing. In December 2025, the family retained legal counsel in Trinidad and the United States to represent Mr. Joseph's estate. The family decided that Ms. Burnley would be Mr. Joseph's personal representative for purposes of U.S. litigation. This litigation is a critical step in enabling Mr. Joseph's family to continue to move towards closure.

43.    In February 2026, on Ms. Burnley's behalf, the family's Trinidad counsel applied to the High Court of Justice of Trinidad and Tobago for an order declaring Mr. Joseph deceased. The

High Court set an initial hearing date on the application for April 29.  On that day, the hearing was moved first to May 5, then to May 7, and then again to May 18. At the May 18 hearing, the presiding judge transferred the case to a different judge, who scheduled a hearing date of July 17 and issued summonses to the Trinidad and Tobago Police Service and Coast Guard to appear to provide updates on the family's missing person's report.

44.    Upon information and belief, once the High Court grants the application and declares Mr. Joseph deceased, the High Court will issue limited grants of administration over Mr. Joseph's estate to Ms. Burnley authorizing her to represent his estate.

<u>Rishi Samaroo</u>

45.    Before the United States killed him, Mr. Samaroo was a 41-year-old resident of Las Cuevas, Trinidad. He was born in Bim Bim Trace, El Socorro, Trinidad, where his elderly father, eight younger siblings (including Ms. Korasingh), and two of his three sons still reside. His elderly mother, who is separated from his father, lives nearby in San Juan.

46.    Until 2009, Mr. Samaroo lived in El Socorro and worked in construction. He was the main breadwinner for his family then, supporting his parents, two of his sons, and his brothers and sisters.

47.    From 2009 until late 2024, Mr. Samaroo was imprisoned for his participation in a homicide. Following his early release on parole, Mr. Samaroo moved to Las Cuevas, where he found work in construction and as a fisherman. While living there, Mr. Samaroo was in regular contact with his family in El Socorro, calling at least one family member daily.

48.    Mr. Samaroo financially supported his parents and two of his sons.

49.    In August 2025, Mr. Samaroo called his sister, Ms. Korasingh, to let her know that he was in Venezuela living and working on a farm there. While in Venezuela, Mr. Samaroo was in

regular contact with Ms. Korasingh and the rest of his family. He called at least one of them at least once a day, and sometimes more, using the WhatsApp video-chat function.

50.   In their frequent communications, Mr. Samaroo shared videos of his work on the farm, where he cared for cows and goats and made cheese.

 

*Rishi Samaroo in Venezuela*

51.   During one of Mr. Samaroo's video chats with Ms. Korasingh, Mr. Samaroo briefly introduced Mr. Joseph. Mr. Samaroo told Ms. Korasingh that Mr. Joseph was a friend of his from Las Cuevas. He said that he and Mr. Joseph fished together and that they were then working on the same farm.

52.   On October 12, Mr. Samaroo called Ms. Korasingh from Venezuela to let her know that he was about to catch a ride on a boat headed for Las Cuevas. Mr. Samaroo's mother had fallen ill, and Mr. Samaroo wanted to come back to help take care of her. Mr. Samaroo also sent Ms. Korasingh a photograph of himself wearing a life jacket. He said that he would see Ms. Korasingh

in a few days. That call was the last time Ms. Korasingh, or anyone else in his family, heard from Mr. Samaroo.



*Rishi Samaroo Before Departing Venezuela for Trinidad*

53.   On or soon after October 14, Ms. Korasingh read social media posts and news reports that the U.S. military had blown up a boat traveling off the coast of Venezuela with six men on board, including two Trinidadian nationals. Ms. Korasingh feared that Mr. Samaroo was aboard this boat, as the timing of the strike directly coincided with Mr. Samaroo's journey by boat from Venezuela to Las Cuevas and, upon information and belief, occurred in waters that Mr. Samaroo traversed on that journey.

54.   Ms. Korasingh called Mr. Samaroo's phone multiple times, as did other family members, but the line was dead. The line remains dead to this day.

55.   Distraught, in October 2025, Mr. Samaroo's family filed a missing person's report about his disappearance. They also arranged for a lawyer to file a Trinidadian Freedom of Information Act request with the Trinidadian government seeking information about the October 14 strike, to which, to date, they have received no response.

56.   As no one has heard from Mr. Samaroo since October 12, his family has concluded that he was a passenger on board the boat that Defendant destroyed on or about October 14.

57. In need of moving towards closure, on October 24, Mr. Samaroo's family held a memorial service for Mr. Samaroo and performed funeral rites.

58. Since then, Mr. Samaroo's family has sought to pursue justice for his unlawful killing. In December 2025, the family retained legal counsel in Trinidad and the United States to represent Mr. Samaroo's estate. The family decided that Mr. Samaroo's youngest sister, Ms. Korasingh, would be Mr. Samaroo's personal representative for purposes of U.S. litigation. This litigation is a critical step in enabling Mr. Samaroo's family to continue to move towards closure.

59. In February 2026, on Ms. Korasingh's behalf, the family's Trinidad counsel applied to the High Court of Justice of Trinidad and Tobago for an order declaring Mr. Samaroo deceased. The High Court set an initial hearing date on the application for April 29. On that day, the hearing was moved first to May 5, then to May 7, and then again to May 18. At the May 18 hearing, the presiding judge transferred the case to a different judge, who scheduled a hearing date of July 17 and issued summonses to the Trinidad and Tobago Police Service and Coast Guard to appear to provide updates on the family's missing person's report.

60. Upon information and belief, once the High Court grants the application and declares Mr. Samaroo deceased, the High Court will issue limited grants of administration over Mr. Samaroo's estate to Ms. Korasingh authorizing her to represent his estate.

<u>The United States' Attempt to Justify Its Lethal Boat Strikes as Lawful</u>

61. Mr. Joseph and Mr. Samaroo were two of at least 215 victims of the United States' 66 lethal military strikes against people on boats since September 2.

62. The United States has publicly defended the boat strikes, including the October 14 strike, as lawful. President Trump, Secretary Hegseth, and other government officials have asserted—sometimes with reference to an OLC legal memo they have continued to keep secret—

that these strikes are part of a non-international armed conflict supposedly involving the United States and unspecified "drug cartels." Top administration officials have further claimed that the boats they assert are carrying drugs—as well as the people on board—are thus legitimate military targets in this so-called armed conflict. According to news reports, the secret OLC memo concludes that by allegedly trafficking drugs, the boats and civilians in them may be lawfully targeted, regardless of whether they pose any actual military threat to the United States, or whether there are means short of lethal force that could reasonably be employed to neutralize any threat they supposedly pose. The memo is the subject of Freedom of Information Act litigation in the Southern District of New York. *See* Compl., *ACLU v. DOJ*, No. 25 Civ. 10189 (S.D.N.Y. Dec. 9, 2025).

63.    The government has not publicly identified all of the drug cartels with which it claims to be at war, and with respect to nearly all its boat strikes, including the one on October 14, it has not identified any cartel it was purportedly targeting. Nor has the government made public any evidence whatsoever to support its assertions that the boats it has blown up and the people it has killed were members of, or even affiliated with, drug cartels. Nor has the government provided any public evidence that targeted boats were, in fact, carrying drugs or that the occupants were trafficking them, let alone that any such drugs were destined for the United States. Indeed, in a June 2, 2026 hearing before the Senate Foreign Relations Committee, Senator Kaine revealed that "the presence of narcotics on a boat is not one of the targeting criteria" for the ongoing boat strikes. Senator Paul agreed, and added that the presence of arms on a boat is likewise not a targeting criterion.

64.    Mr. Joseph and Mr. Samaroo were not members of, or affiliated with, drug cartels. The Trinidadian government has publicly stated that "the government has no information linking

16

Joseph or Samaroo to illegal activities," and that it had "no information of the victims of U.S. strikes being in possession of illegal drugs, guns, or small arms."

65. The government's own admissions demonstrate that its claims about drug trafficking are dubious, if not fabricated. Secretary of State Marco Rubio publicly stated that drugs allegedly onboard the boats were not even destined for the United States, but for Europe. And the U.S. Coast Guard recently acknowledged that, in many cases, boats the government interdicts and searches under suspicion of drug trafficking "off the coast of Venezuela" are ultimately found to have "no illicit contraband aboard."

66. In fact, the White House Chief of Staff admitted in an interview published on December 16, 2025, that the United States' goal in targeting boats had nothing to do with drugs at all, but that the President planned to "keep blowing boats up" until President Nicolás Maduro, of Venezuela, resigned. Since that statement, on January 3, 2026, the United States undertook a military operation in Venezuela, abducted President Maduro and his wife, and reportedly killed scores of people. Since that raid, the government has engaged in 31 more boat strikes, killing 92 people.

### Under Any Available Legal Framework, the Boat Strikes Are Illegal

67. Regardless of any secret evidence the government claims to have to support its unprecedented legal theory, as a matter of plain fact and settled law, there is no bona fide "armed conflict" between the United States and any purported drug cartels (nor was there one when the United States killed Mr. Joseph and Mr. Samaroo) which could justify the use of military force.

68. Under IHL, there are two types of "armed conflicts": "international armed conflicts," and "non-international armed conflicts."

69. An "international armed conflict" or "IAC," as defined under Common Article 2 of the 1949 Geneva Conventions and customary international law, exists only when there are armed

hostilities between two or more States. *See also, e.g.*, Dep't of Def., *Law of War Manual* § 3.3.1 (2015, updated 2023) (confirming U.S. adherence to this IHL definition). The government has not claimed that it is involved in an international armed conflict that justifies its recent campaign of boat strikes, nor has it claimed that the boats it has targeted are military vessels controlled by another State.

70.   A "non-international armed conflict" or "NIAC," as defined under Common Article 3 of the 1949 Geneva Conventions and customary international law, exists between a State and a non-State entity only where there is "protracted armed violence," which is military in character, between a State and an "organized armed group." *See also, e.g.*, *Law of War Manual* § 3.3.1. The government has claimed that the United States is engaged in such a "non-international armed conflict" with drug cartels. But it is not, because the established conditions for such a conflict are not remotely met. Almost every laws-of-war expert agrees. *See, e.g.*, Michael Schmitt, Tess Bridgeman & Ryan Goodman, *Operation Southern Spear: Why the Crews, Drugs, and Boats Are Not Targetable*, Just Security (Dec. 7, 2025), https://www.justsecurity.org/126553/operation-southern-spear-international-law.

71.   With respect to the relevant criteria, first, there is no actual "protracted armed violence" of the kind cognizable under IHL occurring between the United States and any drug cartel. No drug cartel has confronted the United States using military means, such as tanks and other military equipment, in sustained armed clashes. And drug cartels do not engage in "armed violence" merely by trafficking drugs. Organized crime—even when it involves violent acts—does not constitute "armed violence" against a State. Organized crime is just that—a crime that, in the United States, is cognizable and punishable by criminal law alone, subject to constitutional constraints including

18

due process of law. *See, e.g.*, 46 U.S.C. § 705 *et seq.* (regulating criminal maritime drug law enforcement).

72.    Second, the United States is not engaged in hostilities against any drug cartel that constitutes an "organized armed group" under IHL. A non-State entity is an "organized armed group" only when it can operate akin to regular armed forces—that is, with a command structure that imposes discipline and utilizes military tactics in a unified manner. No drug cartel that exhibits these indicia of organization is engaged in military-style protracted armed violence against the United States.

73.    Because these boat strikes did not occur in an armed conflict, the laws of war do not apply. Instead, the rules under international human rights law and federal law regulate the government's strikes. And those rules protect the right to life and prohibit extrajudicial killing. Thus, under the correct legal framework, the government is barred from using lethal force unless, at the time it is applied, lethal force is a necessary last resort to protect against a concrete, specific, and imminent threat of death or serious physical injury. Not even the government has claimed that its strikes could meet this standard. As a result, the strikes are illegal.

74.    Moreover, even if the strikes had somehow been undertaken within an actual armed conflict, they would still be illegal. In an armed conflict, the laws of war constrain the indiscriminate and direct use of force against civilians. Thus, under IHL, if a person is not a member of an opposing State's armed forces or a member of a non-State organized armed group who is directly participating in hostilities, a State is prohibited from using lethal force against them.

75.    Similarly, within an armed conflict, a State may target an object—such as a boat—*only* (i) where doing so makes an effective contribution to military action, (ii) where the object's destruction, capture or neutralization, in the circumstances ruling at the time, offers a definite

military advantage, and (iii) where a strike's military advantage will be proportional to or excessive of its effects, including collateral damage to human life.

76.    Thus, even assuming there was an actual armed conflict (which there was not), no conditions existed to justify the government's lethal strikes against civilians or civilian vessels, including the strike that killed Mr. Joseph and Mr. Samaroo. As a result, even in the context of an armed conflict, the killings of Mr. Joseph and Mr. Samaroo would constitute a grave breach of the 1949 Geneva Conventions, and thus a war crime, making its perpetrators punishable under federal and international law.

* * *

77.    Put another way, the United States' killings of people aboard boats in the Caribbean through missile strikes are wrongful and violate international law regardless of which international legal regime applies. First, because there is, in fact, no non-international armed conflict with the drug cartels purportedly targeted in the strikes (and no evidence that the boats targeted are associated with cartels), the killings violate the bedrock prohibition against extrajudicial killing and are simply murders on the high seas. And second, even if there were a non-international armed conflict between the United States and drug cartels (and even if there were evidence that the boats targeted were associated with the cartels), the strikes would constitute war crimes under the laws of war and federal law.

78.    In particular, the United States' killings of Mr. Joseph and Mr. Samaroo were unlawful. Upon information and belief, the United States' agents, officers, and personnel authorized and directed the strike that killed Mr. Joseph and Mr. Samaroo even though, at the time the strike was carried out, neither Mr. Joseph nor Mr. Samaroo were engaged in activities that presented a concrete, specific, and imminent threat of death or serious physical injury to the United States or

20

anyone at all, and means other than lethal force could have reasonably been employed to neutralize any lesser threat they or the boat they were on might have posed.

79.    Moreover, the killings of Mr. Joseph and Mr. Samaroo were unlawful even if carried out in the context of an armed conflict because, upon information and belief, the United States' agents, officers, and personnel authorized and directed the strike even though Mr. Joseph and Mr. Samaroo were not directly participating in hostilities against the United States at the time of the strike, nor were they members of an organized armed group engaged in an armed conflict with the United States, nor was the boat they were aboard a lawful military target.

## CLAIM FOR RELIEF

### Wrongful Death
### (Death on the High Seas Act, 46 U.S.C. § 30301 *et seq.*)

80.    Defendant United States' military strike against Mr. Joseph and Mr. Samaroo was a wrongful act that caused their deaths and occurred on the high seas, beyond three nautical miles from the shore of the United States, within the meaning of 46 U.S.C. § 30302.

81.    These killings were wrongful because they took place outside of armed conflict and in circumstances in which Mr. Joseph and Mr. Samaroo were not engaged in activities that presented a concrete, specific, and imminent threat of death or serious physical injury, and where there were means other than lethal force that could have reasonably been employed to neutralize any such threat.

82.    Alternatively, even if the United States' lethal strike against Mr. Joseph and Mr. Samaroo occurred during an armed conflict—which it did not—the strike was a wrongful act because it constituted an intentional killing of civilians who were not members of an organized armed group engaged in an armed conflict with the United States and were not directly participating in military hostilities against the United States, rendering it a grave breach of

21

Common Article 3 of Geneva Conventions and a war crime in violation of 18 U.S.C. § 2441(d)(1)(D).

83. Mr. Joseph is survived by various dependents: his mother, Ms. Burnley; his father; his common law wife; and his three minor children. He is also survived by five siblings.

84. Due to the unlawful strike authorized and directed by Defendant's agents, officers, and personnel, Ms. Burnley, Mr. Joseph's wife, and Mr. Joseph's three minor children lost the financial support and contributions Mr. Joseph would have made to them had he lived.

85. Due to the unlawful strike authorized and directed by the United States' agents, officers, and personnel, Mr. Joseph's three minor children lost the nurture, instruction, guidance, physical, intellectual, and moral training they would have received from Mr. Joseph had he lived.

86. Mr. Joseph's dependent relatives are entitled to compensation for these losses. Ms. Burnley, as anticipated personal representative of Mr. Joseph's estate, brings this claim on their behalf.

87. Mr. Samaroo is survived by various dependents: his sister, Ms. Korasingh; his elderly parents; and his three sons. He is also survived by seven other siblings.

88. Due to the unlawful strike authorized and directed by the United States' agents, officers, and personnel, Ms. Korasingh, Mr. Samaroo's elderly parents, and two of his sons lost the financial support and contributions Mr. Samaroo would have made to them had he lived.

89. Mr. Samaroo's dependent relatives are entitled to compensation for these losses. Ms. Korasingh, as anticipated personal representative of Mr. Samaroo's estate, brings this claim on their behalf.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment awarding them:

    A.   Pecuniary damages in an amount to be determined at trial; and

    B.   Such other relief as the Court deems just and proper.


Dated: June 26, 2026

Baher Azmy*
Maria LaHood*
Angelo Guisado*
Ayla Kadah*
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
bazmy@ccrjustice.org
mlahood@ccrjustice.org
aguisado@ccrjustice.org
akadah@ccrjustice.org

Jonathan Hafetz*
1109 Raymond Blvd.
Newark, NJ 0710
(917) 355-6896
jonathan.hafetz@shu.edu



*Attorneys for Plaintiffs*

*Admitted *pro hac vice*

Respectfully submitted,

*/s/ Jessie Rossman*
Jessie J. Rossman (BBO 670685)
Suzanne Schlossberg (BBO 703914)
ACLU FOUNDATION OF
MASSACHUSETTS, INC.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
sschlossberg@aclum.org

Brett Max Kaufman*
Steven M. Watt*
Jeffrey Stein*
Hina Shamsi*
Ben Wizner*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
bkaufman@aclu.org
swatt@aclu.org
jstein@aclu.org
hshamsi@aclu.org
bwizner@aclu.org

23